# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## (GREENBELT)

JOSEPHINE VIRGINIA GRAY, )
)
    Petitioner )
)
vs. ) 8:01-cr-00566-DKC-1
)
)
UNITED STATES OF AMERICA, )
)
    Respondent )

JUN 14 2021

## PETITION FOR LEAVE TO PETITION AND MEMORANDUM IN SUPPORT OF PETITION FOR RELIEF UNDER THE FIRST STEP ACT AND THE CORONAVIRUS RELIEF (CARES) ACT

COMES NOW, your Petitioner in the instant case, pro se, who respectfully files for leave to file this Petition and Memorandum in Support of said Petition for relief, pursuant to Section 404(b) of the First Step Act of 2018 and The Coronavirus Relief (CARES) Act for an order immediately transferring Petitioner to home confinement, or reducing Petitioner's sentence instanter, and in support thereof, states as follows:

## STATEMENT OF JURISDICTION

This United States District Court for the District of Maryland at Greenbelt has jurisdiction over all offenses against the criminal laws of the United States which take place in that district, under 18 U.S.C. Section 3231, 21 U.S.C. Section 41(a)(1)(b)(1)(A), and 21 U.S.C. Section 846.. Petitioner has exhausted administrative remedies as required under the First Step Act and administrative remedies under the CARES Act.

1

## PROCEDURAL HISTORY

Petitioner was charged in 20014 with multiple violations of 18 U.S.C. § 1341, Mail Fraud, Aiding and Abetting. After a jury tril in 2002, she was found guilty of multiple counts and received a sentence total of 480 months; Supervised Release, 3 years, each count, concurrent; and Restitution: $154,000; S/A: $800.00. She filed a direct appeal, which was affirmed, and a 2255, which was also denied. She now files her petition for Compassionate Release and other relief under the First Step Act and the CARES Act, having fully exhausted all requirements requiring her to seek compassionate release from the warden of her institution. She has sought such release, and been denied by the warden.

## I. PETITIONER'S CONTINUING CHRONIC HEALTH ISSUES, GIVEN THE CURRENT HEALTH CRISIS, AND HER CONDTIONS OF CONFINEMENT, ARGUE FOR AN IMMEDIATE RELEASE TO HOME CONFINEMENT.

COVID-19 has found its way to the Petitioner's facility. Unlike the conditions at the time Petitioner previously applied, the virus has infected hundreds of prisoners and many administrative staff. It continues to be present in her facility. Petitioner, who is 74, and has served 19 years and approximately 50% of her sentence, has a well-documented history of chronic medical conditions, including obesity, hypertension, hypermetropia, increased generalized pain and muscle weakness. She relies upon the use of a wheelchair and requires a pusher and assistance with transfers, and has been prescribed a walker and cane. She is in constant pain, which is not being treated by the prison. Not surprisingly,

all of these conditions put her at extremely high risk of death should Petitioner be infected with the Covid-19 virus. According to the Centers for Disease Control and Prevention (CDC), the vast majority of COVID-19 cases are mild. However, older people and individuals with underlying chronic conditions are at higher risk of developing more serious COVID-19 illness, especially if you have multiple co-morbidities.

According to the CDC, "Taking everyday precautions to keep space between yourself and others (social distancing). Keeping away from others who are sick, limiting close contact, and washing your hands often when in public. Avoiding crowds as much as possible." None of these precautions are of course possible in a prison environment.

Carswell is notorious for providing poor medical care, and is essentially a large nursing home that is severely understaffed. The facility lost its medical accreditation many years ago, and now functions as a sub-standard nursing home, infamous of its staff general indifference to the pain and suffering of many of it residents. Petitioner has sought medical attention for her multiple medical problems from prison medical staff on a regular basis, and has not yet been followed up on by staff. Unfortunately, as shown by the DOJ's own Inspector General, the BOP is unable to fill even basic institutional health care positions, and has cancelled all but emergency transport to outside medical facilities. oig.justice.gov.

According to medical experts as well as the Center for Disease Control, (CDC), these medical conditions puts Petitioner at risk of death from the Covid-19 virus sweeping the country and beginning to infect the nation's local, state, and federal prisoners. Petitioner's facility is currently on lock down, and visitors are no longer permitted. However, staff, who are free to move about the general community, interacts

3

on a daily basis with prisoners, including Petitioner. She is housed in a unit where social distancing is impossible. Carswell also receives regular transfers from other prisons and county jails, including the infamous Grady County, Oklahoma, which ahs been blamed for serious virus outbreaks at numerous facilities, including Carswell. Even those who have technically "recovered" from virus exposure are subject to reinfection and need continued medical care which the BOP has consistently proven itself unable to provide. www.cdc.gov.

Bunks are approximately 3 feet apart. TV rooms, which measure from 180 to 380 square feet are generally full in the evening, with 15 to 30 plus prisoners in each one. Computer rooms and video visit rooms are similarly cramped, with individuals sitting 2 to 3 feet from each other. None of the computers or keyboards are regularly cleaned, despite multiple usages, and all of these common areas are only cleaned once a day. Three phones are located within a six foot span, again making social distancing impossible while trying to stay connected with family.

Mail distribution is carried out in a small area with prisoners shoulder to shoulder. Daily counts are conducted at a minimum of twice daily with inmates standing shoulder to shoulder. Town hall informational meetings are conducted in the same manner. Officers coming through the units to count do not wear masks, and claim that they have not been ordered to do so. Hand soap is often absent from the bathrooms, with very limited supplies of paper towels, with most using toilet paper to dry their hands.

Prisoners have been sent out for medical trips and then brought back to the housing units after being in the community and are not quarantined prior to being place back with the general population. Prisoners who appear to be COVID-positive are often

placed back in the unit. This practice obviously increases the chances of introducing COVID-19 into the facility.

As the Court well knows, COVID-19 has spread across the globe and throughout the United States. Policymakers at every level of government have recognized the dire risks of COVID-19. On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. Bill Chappell, Corona virus: COVID-19 is Now Officially a Pandemic, WHO Says, NPR (Mar. 11, 2020), https://tinyurl.com/tpy4v8s.

To mitigate the COVID-19 pandemic, governmental authorities in the United States have issued guidelines and advice for citizens to follow. For example, the CDC's guidance document recommends the following: - "Work or engage in schooling FROM HOME whenever possible." - "AVOID SOCIAL GATHERINGS in groups of more than 10 people." - "Avoid eating or drinking at bars, restaurants, and food courts." - "AVOID DISCRETIONARY TRAVEL, shopping trips, and social visits." - "DO NOT VISIT nursing homes or retirement or long-term care facilities unless to provide critical assistance." CDC, The President's Corona virus Guidelines For America at 2 (emphasis in original), https://tinyurl.com/v9kngde. III. The Pandemic's Effect on Communal Living Spaces Communal living spaces present especially serious risks related to COVID-19. One highly publicized example is nursing homes. These communities are "at risk because residents live in tight proximity, with staff interacting closely with them." Jon Kamp, Corona virus Outbreaks Spreading in Nursing Homes, The Wall Street Journal (Mar. 19, 2020).

Custodial living spaces, such as prisons and jails, and halfway houses present the same risks. Incarcerated individuals are more vulnerable to contract the disease because

5

they live in cells with multiple people in close quarters, are regularly required or allowed to inhabit communal spaces for eating, bathing, or awaiting transport to or from court, and are nearly always in close contact with other people. The active vulnerability of the prison population in turn compounds the risk to the public health because lawyers, correctional officers, and other staff are coming into and out of the prison and therefore can carry to the outside world any diseases that festered inside. Understanding these concerns, governmental authorities increasingly are attempting to release prisoners affected by COVID-19. See, e.g., Julia Marsh, NYC to begin releasing inmates amid coronavirus outbreak, New York Post (Mar. 18, 2020), https://tinyurl.com/trba737. Courts around the country are addressing issues relating to incarceration; for example, the extension of self-surrender dates due to COVID-19.

The COVID-19 virus can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity. COVID-19 may also target the heart muscle, causing a medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work. People of all ages and medical backgrounds who have experienced serious cases of COVID-19 describe painful symptoms including vomiting, severe diarrhea, relentless shivering, and suffocating shortness of breath.

Emerging evidence suggests that COVID-19 can also trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can

result in widespread damage to other organs, including permanent injury to the kidneys and neurological injury.

These complications can manifest at an alarming pace. Individuals can show the first symptoms of COVID-19 infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner. People can also spread COVID-19 but be asymptomatic. Most people who develop serious disease will need advanced support. This level of supportive care requires highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. This level of support can quickly exceed local health care resources. This level of medical support does not exist in the federal Bureau of Prisons and certainly not at Petitioner's institution.

The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza. According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems. For people in the highest risk populations, the fatality rate of COVID-19 infection is about 15 percent—ten times the average rate. Preliminary data from China showed that 20 percent of people in high-risk categories who have contracted COVID-19 there have died. People who experience serious cases of COVID-19 who do not die from COVID-19 should expect a prolonged recovery, including the need for extensive rehabilitation for profound reconditioning, loss of digits, neurological damage, and the loss of respiratory capacity.

There is no vaccine against COVID-19, nor is there any known medication to prevent or treat infection. The only known effective measures to reduce the risk for vulnerable people from injury or death from COVID-19 are to prevent them from being infected in the first place, and to limit community spread. Social distancing or remaining physically separated from known or potentially infected individuals, and vigilant sanitation and hygiene, including repeatedly and thoroughly washing hands with soap and water, are the only known effective measures for protecting vulnerable people from COVID-19. As previously noted, Petitioner has no access to the types of sanitary and germ killing materials needed to protect herself from this disease.

It is also well known that the Bureau of Prisons has not done extensive testing of either prisoners or staff in sufficient numbers to properly identify those who are suffering from the illness, putting everyone in those facilities at increased risk. Thousands of prisoners and staff have become infected, and uncounted number have already died. Under these circumstances, it would be highly prudent to have Petitioner transfer directly to home confinement, and complete the sentence away from the crowded atmosphere of the prison. On April 3, 2020, Attorney General Barr issued a memo to all Bureau of Prisons Wardens directing them to seriously consider for release all prisoners with underlying health issues that would make them susceptible to illness and death. Dozens of district courts around the county have sent prisoner to home confinement as a result of this pandemic.

In one such case, Wilson v. Williams 20-cv-794, a federal Judge in Cleveland, Ohio, Judge James Gwin, granted an injunction compelling officials at the Elkton Federal Correctional Institution to identify and release medically vulnerable inmates due

to the spread of Covid-19. Unfortunately, the evidence is clear that the Bureau of Prisons lacks either the resources or the will to test all of its prisoners and control the virus, putting Petitioner at extreme risk. The BOP has proven itself incapable of handling the outbreak, and it meager health-care resources are quickly overwhelmed. In FCI Elkton, the Ohio National Guard had to be called in to take over the medical crisis there that resulted in hundreds of sick prisoners and staff and many deaths. At FCI Oakdale, Louisiana, a similar failure on the part of BOP medical staff to contain the outbreak required the CDC to take over testing and treatment. At FCI Forrest City, the CDC built a tent hospital on prison grounds, and after extensive testing CDC has found that over half of the prisoners and many staff are COVID-19 positive, and there have also been many deaths. In three California BOP facilities, the situation is even more dire. Carswell Federal medical center has more than half of it occupants testing positive.

## II. THE ATTORNEY GENERAL, THE BUREAU OF PRISONS, AND THE COURTS ARE EMPOWERED UNDER THE CORONAVIRUS RELIEF ACT TO TRANSFER PETITIONER TO HOME CONFINEMENT

Under this legislation, if the Attorney General "finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a person in home confinement under the first sentence of section 3624(c)(2) of Title 18, U.S.C., as the Director determines appropriate."

Former Attorney General Barr also issued a memo on April 3, 2020, that encouraged the Bureau of Prisons to "expand home confinement, particularly for those older prisoners who have served substantial parts of their sentences and no longer pose a

threat and may have underlying conditions that make them particularly vulnerable," to slow the spread of the infection, and most recently even for inmates who have served less than 50% of their total sentence. It is clear that Petitioner would clearly be much safer at home than in prison, where she would still be under the supervision of the federal government.

### III. FEDERAL JUDGES CAN REDUCE SENTENCES FOR PEOPLE WHOSE CASES PRESENT "EXTRAORDINARY OR COMPELLING REASONS" UNDER THE COMPASSIONATE RELEASE STATUTE IN 18 U.S.C. § 3582(C)(1)(A)(I).

Under current law, federal judges have been limited in the ways that they can consider and reduce a sentence once a final judgment is imposed. One way that judges can modify a sentence is through the compassionate release statute under 18 U.S.C. § 3582(c), which is often used to resentence someone who is terminally ill.

The recently enacted First Step Act, courts can also use the compassionate release statute as a second look provision in cases that present "extraordinary and compelling reasons."

A. The history of second look compassionate release and its expanding development. The compassionate release statute was originally enacted as part of the Parole Reorganization Act of 1976.76 Codified at 18 U.S.C. § 4205(g), it read as follows: At any time upon motion of the Bureau of Prisons, the court may reduce any minimum term to the time the defendant has served. The court shall have jurisdiction to act upon

10

the application at any time and no hearing shall be required. Importantly, the Section 4205(g) remedy of a sentence reduction was not limited in scope to mere medical issues.

In United States v. Diaco, a district court reduced a sentence upon motion of the BOP and U.S. Attorney. The court noted that Diaco had been "a model prisoner," and the court reduced his five-year sentence based on sentencing disparities between Diaco and his more culpable co-defendants, who had only served six months imprisonment. In United States v. Banks, the BOP Director had filed a motion for a sentence reduction, arguing that Banks, who was serving time for armed robbery, had "outstanding institutional adjustment," and "[h]is conduct record is clear and his work uniformly competent.

The district court granted the motion in the face of the U.S. Attorney's office that argued against the BOP recommendation "because of the serious nature of Mr. Banks' offense. "In sum, Section 4205(g) was used to correct and reduce long sentences where a person in prison showed a demonstrated record of rehabilitation, and this was the compassionate release statute Congress was familiar with when it enacted the modern compassionate release statute. Congress enacted the modern form of the compassionate release statute contained in 18 U.S.C. § 3582 as part of the Comprehensive Crime Control Act of 1984. Section 3582(c) states that a district court can modify even a final "term of imprisonment" in four situations, the broadest of which is directly relevant here. A sentencing court can reduce a sentence if and whenever "extraordinary and compelling reasons warrant such a reduction."

Congress never defined what constitutes an "extraordinary and compelling reason" for resentencing under Section 3582(c). But the legislative history gives an

11

indication of how Congress thought the statute should be employed by federal courts. One of Congress's initial goals in passing the Comprehensive Crime Control Act was to abolish federal parole and create a "completely restructured guidelines sentencing system."

Congress intended for Section 3582(c) to act as "safety valves for modification of sentences," enabling sentence reductions when justified by various factors that previously could be addressed through the (now abolished) parole system. The safety valve would "assure the availability of specific review and reduction to a term of imprisonment for 'extraordinary and compelling reasons' and [would allow courts] to respond to changes in the guidelines."

Noting that this approach would keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, the statute permitted "later review of sentences in particularly compelling situations." Congress thus intended to give federal sentencing courts an equitable power that, unlike parole, would be employed on an individualized basis to correct fundamentally unfair sentences. And there is no indication that Congress limited the compassionate release safety valve to medical or elderly.

There is nothing unusual about Congress legislating a broad and open standard and then delegating that particularized application of that standard to an executive agency or the federal judiciary. Congress has, for example, delegated to the judiciary to define what constitutes a "reasonable attorney's fee" under the various civil rights statutes. U.S.C. § 2000a-3(b); see also Frank H. Easterbrook, Statutes' Domains, 50 U. CHI. L. REV. 533, 544 (1983) ("The statute books are full of laws, of which the Sherman Act is a

good example, that effectively authorize courts to create new lines of common law.").

The U.S. Sentencing Commission has also concluded that Section 3582(c)(1)(A)'s "extraordinary and compelling reasons" for compassionate release are not limited to medical, elderly, or family circumstances. Congress initially delegated the responsibility for determining what constitutes "extraordinary and compelling reasons" to the Commission. Congress provided only one limitation to that delegation of authority: "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Congress no doubt limited the ability of rehabilitation alone to constitute extraordinary circumstances, so that sentencing courts could not use it as a full and direct substitute for the abolished parole system. Congress, however, contemplated that rehabilitation could be considered with other extraordinary and compelling reasons sufficient to resentence people in individual cases. Indeed, the use of the modifier "alone" signifies just the opposite: that rehabilitation could be used in tandem with other factors to justify a reduction. The Commission initially neglected its duty, leaving the BOP to fill the void and create the standards for extraordinary and compelling reasons warranting resentencing.

The Commission finally acted in 2007, promulgating a policy that extraordinary and compelling reasons includes medical conditions, age, family circumstances, and "other reasons." After a negative DOJ Inspector General report found that the BOP had rarely moved courts for compassionate release even under their own policies, the Commission amended its policy to encourage the BOP to file motions for compassionate release more often. The Commission created several categories of qualifying reasons: (A) "Medical Conditions of the Defendant," including terminal illness and other serious

13

conditions and impairments; (B) "Age of the Defendant," for those 65 and older with serious deterioration related to aging who have completed at least 10 years or 75 percent of the term of imprisonment; (C) "Family Circumstances," where a child's caregiver or spouse dies or becomes incapacitated without an alternative caregiver; and (D) "Other Reasons," when the Director of the BOP determines there is "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) 89 S. Rep No. 98-225, supra note __, at 55–56. 90 See 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). 28 U.S.C. § 994(t) (emphasis added).

The BOP created policies governing compassionate release. The latest version prior to passage of the First Step Act was Program Statement 5050.49, Compassionate Release/Reduction in Sentences (Mar. 25, 2015). 93 U.S.S.G. § 1B1.13, Application Note 1(A). See U.S. Dep't of Justice Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program (Apr. 2013). Id. at Application Note 4; see also United States v. Dimasi, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the progression from the OIG report to new "encouraging" guidelines). 16 through (C)." The Commission also clarified that the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." This policy has been updated to reflect the language of the First Step Act.

Federal judges now have the power to order reductions of sentences even in the face of BOP resistance or delay in the processing of applications. The legislative history leading up to the enactment of the First Step Act establishes that Congress

14

intended the judiciary not only to take on the role that BOP once held under the First Step Act compassionate release statute as the essential adjudicator of compassionate release requests, but also to grant sentence reductions on the full array of grounds reasonably encompassed by the "extraordinary and compelling" standard set forth in the applicable statute.

Petitioner has accumulated an excellent institutional record, which argues strongly in favor of release to home confinement. Petitioner has sufficient resources and a release plan.. She has a minimum PATTERN security score, and has furlough transferred from her previous institution without incident. She has shown herself to be a serious, studious individual, who has received relatively minor disciplinary infractions in a crowded and occasionally violent institution, with all security levels, where assaults and fights are common. Removed from such a violent environment and returned to the arms of her large, compassionate, and loving family, she would be an excellent candidate for home confinement, which still is considered incarceration, but would not subject Petitioner to the health risks of the COVID-19 pandemic. Although Petitioner has taken responsibility for her past offenses, given her advanced age, poor health including chronic pain, and the fact that she will live with family for the foreseeable future argues convincingly that her chance of recidivism is extremely low, and given the fact that she is poor health and confined to a wheelchair, she would NOT be a threat to the community if released.

Petitioner has served a significant number of years of her sentence, taken various courses, and has turned her life around to the extent that, such that she is no longer a threat to the community and is in a strong position to become a positive member of society, and is a limited risk to recidivate due to her poor health and advancing age.

Petitioner would be released to her large, loving family, who would provide her with housing, medical care and transportation. A release at this time would not minimize the seriousness of her offense, but would recognize the reality of her failing health.

## CONCLUSION

As previously set forth, Petitioner has established her eligibility to relief, and Defendant/Petitioner respectfully moves this Honorable Court grant this Petition to grant Compassionate Release and/or immediate release, based upon "Extraordinary and compelling" reasons, as set forth herein, appoint counsel to represent Petitioner in subsequent proceedings, and all other relief that this Honorable Court deems just.

Respectfully Submitted,

By: *Josephine V. [signature]*

## CERTIFICATE OF SERVICE

I, Petitioner, do hereby certify that a true and correct copy of this Reply was duly caused to be served on all parties entitled to notice via the Prison Mailbox Rule on the 1 day of may, 2021, via First Class Mail.

Signed: *Josephine V. [signature]*